IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION                                          PLAINTIFF

v.                        CIVIL ACTION NO. 5:24-cv-05195-TLB

NORTHWEST ARKANSAS HOSPITALS, LLC
d/b/a NORTHWEST MEDICAL
CENTER-BENTONVILLE                                              DEFENDANT

BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.  INTRODUCTION

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this action on behalf of a non-certified surgical technician, Efrin Chavez ("Chavez"), who briefly worked at Northwest Arkansas Hospitals, LLC ("NWAH" or the "Hospital") before he voluntarily resigned. The EEOC originally alleged NWAH discriminated against Chavez on the basis of his sex, which is male, and constructively discharged him from his employment (Doc. 26). The court dismissed Chavez's constructive discharge claim (Doc. 48) and, as set forth herein, NWAH now moves this court to dismiss the EEOC's remaining claim of sex discrimination, which is also baseless.

Chavez worked part-time, two days a week, in the Labor and Delivery unit at the Hospital from January to July 2022. During that time, two non-employee obstetric physicians, Drs. Katie Beal and Amy Fry ("Beal" and "Fry" individually, and the "Physicians" collectively), who have privileges to deliver at NWAH, declined to have Chavez in the room during vaginal deliveries after a patient asserted her right to privacy pursuant to 42 CFR §482.13(c)(1). The patient asked that Chavez leave the room but he failed to do so, which resulted in the patient's written complaint to the Hospital. The EEOC argues the Physicians made their decision because Chavez is male. But

these Physicians, each of whom was deposed, testified they felt Chavez did not respect their patients' privacy interests, so they removed him from future deliveries based on his conduct, not his sex.

It is undisputed that NWAH received this patient's written complaint regarding Chavez's behavior, that both Physicians experienced patients voicing concerns regarding Chavez, and that Chavez assisted both Physicians in vaginal deliveries up to the point when they received the written complaint. Chavez would have continued to assist these Physicians had they not received the complaint that he disregarded a patient's assertion of her privacy rights in regard to a demand he leave the delivery room. In fact, both these Physicians testified that male employees at NWAH assist them regularly during vaginal deliveries, demonstrating that a person's sex alone does not bar an NWAH employee from participating in vaginal deliveries with these Physicians. Such an argument does not even make sense, as ample deposition testimony exists that various NWAH positions are occupied by males who assist during vaginal deliveries. Further, it is also undisputed that these Physicians have removed a female employee at NWAH for failing to follow directions, just like Chavez, further undercutting the notion that an employee's sex factors into the Physicians' decision-making.

Multiple witnesses, including Chavez, admitted that he continued to assist several other doctors in the Labor and Delivery unit at the Hospital with their vaginal deliveries, and that he never lacked for work. He also experienced no loss in pay, no change in job title or work schedule, and no modification of job duties or responsibilities as a result of these two Physicians declining his assistance in the room during future vaginal deliveries. After working another six months, Chavez resigned to attend nursing school and because he was working another job closer to home with less of a commute. Simply put, Chavez never suffered any adverse action while working at

NWAH. Further, no similarly situated employees outside Chavez's class of males were treated more favorably.

As there is no genuine dispute of material fact that Chavez was discriminated against based on his sex, the Hospital moves for summary judgment pursuant to Fed. R. Civ. P. 56 on this single remaining claim brought by the EEOC. Contemporaneously with its motion for summary judgment, NWAH submits this brief in support.

## II.  GENERAL SUMMARY OF THE RELEVANT FACTS[1]

### A.    NWAH's Equal Employment Opportunity Policies and Chavez's Onboarding

NWAH hired Chavez on December 7, 2021, as a noncertified surgical technician in the Labor and Delivery unit, where he earned $18.00 per hour (SMF ¶ 1). During onboarding, Chavez received NWAH's employee handbook, which includes an Equal Employment Opportunity policy prohibiting sex discrimination and establishes a clear procedure for reporting sexual harassment or discrimination (SMF ¶ 2). The handbook also outlines instructions for employees to access a Confidential Disclosure Program Hotline for anonymous reporting of any known or suspected violations of law or policy (SMF ¶ 4). NWAH also maintained a Code of Conduct in 2021-2022 during Chavez's employment with specific instructions on how to report discrimination in the workplace that would have been presented during new hire orientation (SMF ¶ 3). Chavez attended several weeks of orientation and training, including review of NWAH's anti-discrimination, anti-harassment, and anti-retaliation policies (SMF ¶¶ 5-7). He was also aware of prominent signage in the Labor and Delivery unit informing employees how to report discrimination (SMF ¶ 95).

---

[1] NWAH incorporates by reference the Statement of Undisputed Material Facts ("SMF") filed contemporaneously with the motion and brief.

**B.    Chavez's Role and Duties and NWAH's Labor and Delivery Unit**

Chavez worked part-time, typically two shifts per week, and was managed by Jennie McClain, NWAH's then Director of Women's Services (SMF ¶¶ 8-9). As a noncertified surgical technician with no prior surgical technician experience, Chavez was not permitted to assist in operating rooms during cesarean sections due to his lack of certification, experience or training (SMF ¶¶ 12, 14-15, 100). Rather, his typical duties involved preparing the obstetrics ("OB") room prior to delivery, assisting during delivery when requested and post-delivery cleanup, and performing various postpartum tasks like monitoring and recording room temperatures, completing patient paperwork, putting together care packages, bathing newborns, and recording vitals (SMF ¶¶ 16-21). Chavez always had work to do, consistent with his defined job duties, such ensuring the OB rooms were stocked properly and setting up for future deliveries (SMF ¶ 21).

Standard practice for vaginal births in the OB room involves staffing a nurse for the patient, a nurse for the newborn, and the OB-GYN (SMF ¶ 22). Noncertified surgical technicians are not considered medically necessary or essential for vaginal births in the OB room (SMF ¶ 23). During a vaginal delivery, the patient is commonly disrobed from the waist down with their legs in stirrups, leaving their vagina, perineum, and anus exposed (SMF ¶ 24). By virtue of his role, Chavez was exposed to female genitalia, but he was required to be professional, and Chavez stared at patients during deliveries to the point of making them uncomfortable (SMF ¶¶ 25-28).

**C.    Patient Privacy Concerns and Provider Responses**

Many patients expressed discomfort with the presence of non-essential male staff, such as Chavez, due to privacy concerns, including the patient's comfort level, past traumatic sexual experiences, cultural norms, and religious practices (SMF ¶ 30). Patients tell their doctors when they do not want non-essential staff, individuals with whom they grew up, family members, students, or others present in the delivery room (SMF ¶ 35). The non-employee obstetric doctors

4

with rights to deliver at NWAH, including Drs. Fry and Beal, discuss patient preferences with the Hospital, who honors these requests—regardless of sex—when patient safety is not affected (SMF ¶¶ 31-37).

**D.      Incidents Involving the Physicians and Chavez's Declined Assistance**

On January 18, 2022, Dr. Amy Fry, having a long-standing physician-patient relationship with a laboring patient, was aware the patient did not want males present during her vaginal delivery (SMF ¶¶ 38-40). Dr. Fry specifically arranged an induction so she would be the one delivering the baby and informed the nursing staff that Chavez would not be able to assist with this delivery due to the patient's stated privacy interests, pursuant to 42 CFR 482.13(c) (SMF ¶¶ 41-42). Dr. Fry checked on this patient when she was rounding that morning around 6:30 a.m., left the room to check in with her other patients, and then was called back around 11:00 a.m. to deliver the patient's baby (SMF ¶ 43). Chavez was in her OB room while the patient was laboring, and, in response, the patient specifically requested that Chavez leave the room due to discomfort with his presence (SMF ¶ 44).

After the baby was delivered, the patient's chest was exposed because she was having skin-to-skin contact with her baby; the patient was "still in stirrups with her vagina, perineum and anus exposed" (SMF ¶ 48). While Dr. Fry was "trying to massage and wait on the placenta delivery, [the patient] look[ed] up and she close[d] her legs down" (SMF ¶ 49). The patient looked over Dr. Fry's "shoulder, she immediately clamped her legs together, which restricted what [Dr. Fry] was able to do, as far as vaginal and perineum" (SMF ¶ 50). Dr. Fry then turned around to see what caused the patient to clamp her legs and restrict Dr. Fry's ability to deliver the placenta to find Chavez standing in the corner of the room "staring at the patient's vulva, vagina and perineum" (SMF ¶ 51). Dr. Fry, knowing the patient's privacy interests, and recalling that she

asked the nursing staff to not have Chavez assist with her delivery, "stared at him until he left" (SMF ¶ 52).

On January 26, 2022, Dr. Fry's patient submitted a written complaint to NWAH, expressing that Chavez's presence made her upset, that her privacy rights were disregarded, and that she felt disrespected (SMF ¶ 54). The patient complained that Chavez entered the room and remained there during her delivery despite her request for him to leave (SMF ¶ 55). This was the first time Dr. Fry learned that Chavez had been asked to leave by the patient before she personally saw him standing in the corner of the room and realized he did not honor the patient's request (SMF ¶ 56).

Dr. Fry informed her colleague, Dr. Katie Beal, about Chavez's conduct as outlined in the patient's complaint (SMF ¶ 57). The Physicians believed the patient's account and complaint regarding Chavez (SMF ¶ 58). Dr. Beal had a similar experience with Chavez on January 19, 2022, when her patient was visibly uncomfortable with Chavez's presence, holding her knees together and refusing to push (SMF ¶¶ 59-60). Dr. Beal observed Chavez in the back of the room, not assisting, but "just staring at her genitalia," which Dr. Beal described as "very much unprofessional staring" (SMF ¶ 61). When Dr. Beal noticed her patient's reaction to Chavez's presence in her delivery, Dr. Beal asked him to leave (SMF ¶ 62).

The Physicians manage their patients together, so one physician's decision impacts the other's (SMF ¶ 64). After receiving the written complaint from the patient on January 26, 2022, the Physicians decided that Chavez would not be allowed to assist in their future vaginal deliveries (SMF ¶¶ 65-66). Chavez had been assisting both doctors prior to the written complaint (SMF ¶¶ 53, 63). Neither Dr. Beal nor Dr. Fry declined Chavez's assistance because he was male; rather,

6

their decision was based on his unprofessional behavior and lack of respect for patient privacy (SMF ¶ 67).

Chavez was informed by Cassidy Lancelot (formerly Cassidy Squires) ("Lancelot"), a certified surgical technician, that the Physicians declined his assistance in their future deliveries (SMF ¶ 68).

**E.    Additional Patient Requests and Chavez's Continued Employment**

After these events, other patients and family members also requested that Chavez not be present in their OB rooms during deliveries due to similar privacy concerns (SMF ¶¶ 69-72). In one instance, a patient's husband was uncomfortable with Chavez's presence; in another, a patient asked that Chavez be removed because his presence made her uncomfortable (SMF ¶¶ 70-71). Chavez was "sure there w[ere] a couple more . . . instances where that happened," i.e., where patients asked for him to be excluded from their OB rooms, but he was unable to recall any other specific instances during his deposition (SMF ¶ 72). Chavez was also asked to leave a patient's room in the postpartum unit because she was unclothed and breastfeeding her new baby (SMF ¶ 73).

Despite the Physicians declining his assistance in their deliveries, Chavez continued to work at NWAH for over six months, performing his standard job duties alongside at least four other physicians (Drs. Amy Sarver, Lisa Bearden, Natalie Eiland, and Amber Sills), with no changes to his pay, hours, or responsibilities (SMF ¶¶ 74-81). The other physicians Chavez continued working with accounted for approximately 50% of all vaginal deliveries during the relevant period (SMF ¶¶ 109-110). The number of deliveries performed by each OB-GYN fluctuated monthly with doctors other than the Physicians delivering the most babies in certain months (SMF ¶¶ 112, 114). Chavez was able to assist during vaginal deliveries each month, irrespective of which OB-GYN conducted the most deliveries in any given month (SMF ¶ 115).

7

**F.    Chavez's Voluntary Resignation**

Chavez voluntarily submitted his two weeks' notice of resignation on July 7, 2022, explaining he was working another job closer to home and planned to attend school (SMF ¶¶ 82, 84-85, 88). Chavez stated he enjoyed his time working at NWAH and expressed his appreciation for providing him the opportunity to work for NWAH (SMF ¶ 83). The other job Chavez worked that was closer to his home was Arkansas Children's Hospital, located in Springdale, Arkansas, which is the same area in Arkansas in which Chavez was living in July 2022 (SMF ¶¶ 85-87). The Hospital was simply a longer commute (SMF ¶ 87). The schooling Chavez was soon resuming as of July 2022 was a licensed practical nursing ("LPN") program through Northwest Technical Institute, which was a 16-month program (SMF ¶ 88). He told at least three members of management that he was resigning for these reasons, expressed appreciation for his time at NWAH, and did not voice any complaints regarding discrimination to management or human resources at any time during his employment (SMF ¶¶ 83-90, 96). In fact, NWAH tried to get Chavez to stay in the position, but he declined so he could go to school and minimize his commute (SMF ¶¶ 91-92). Chavez's resignation became effective July 24, 2022 (SMF ¶ 93).

**G.    NWAH's Staffing Practices**

NWAH has no written or unwritten policy that males are not allowed in the OB rooms or the operating rooms in the Labor and Delivery unit (SMF ¶ 118). NWAH employs male OB-GYNs, anesthesiologists, nurses, CRNAs, circulator nurses, food service workers, respiratory therapists, and neonatologists who regularly perform tasks in OB rooms concerning vaginal deliveries (SMF ¶ 119). When a patient declines these male providers' assistance, however, these male providers will not assist unless their absence would compromise patient safety (SMF ¶ 120). For example, male nurse BJ Wiseman introduces himself to patients, explains his role, and ensures the patient is comfortable (SMF ¶ 121). The Physicians both use BJ Wiseman in their vaginal

deliveries (SMF ¶ 122). The Physicians did not decline all males from assisting with their vaginal deliveries but, rather, just Chavez due to his conduct (SMF ¶ 123).

The Physicians have also declined the assistance of female staff in their OB rooms for unprofessional conduct (SMF ¶¶ 116-117). Dr. Beal excluded a female nurse from her deliveries for engaging in unprofessional conduct with her patients (SMF ¶ 116). Dr. Fry likewise excluded a female nurse from her deliveries for making inappropriate comments to patients and for failing to follow orders (SMF ¶ 117).

Chavez worked with one employee who held the position of *noncertified* surgical technician at NWAH but worked full-time and was more advanced in her training and knowledge, and one employee who held the position of *certified* surgical technician with different responsibilities and years of prior experience (SMF ¶¶ 97-105). Chavez was only part-time, working two days a week, and was not fully trained (SMF ¶¶ 8, 15, 100). He had no prior experience as a surgical technician (SMF ¶ 108).

### III.  LEGAL STANDARD

Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a plaintiff cannot establish the existence of an essential element in any cause of action for which it bears the burden of proof at trial, summary judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may

9

be granted." *Id.* at 249-50 (citations omitted); *accord Barber v. C1 Truck Driver Training LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (explaining that the mere existence of a scintilla of evidence is insufficient to defeat summary judgment).

A party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Moss v. Texarkana Ark. Sch. Dist.*, 240 F. Supp. 3d 966, 972 (W.D. Ark. 2017) (quoting *Anderson*, 477 U.S. at 256). The nonmoving party must substantiate allegations by "sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Barber*, 656 F.3d at 801 (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). Ultimately, "[e]vidence, not contentions, avoids summary judgment." *Al-Zubaidy v. Tek Indus., Inc.*, 406 F.3d 1030, 1036 (8th Cir. 2005) (quoting *Mayer v. Nextel West Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## IV.  LEGAL ARGUMENT

Title VII prohibits employers from discriminating against employees based on sex with respect to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1).

In the absence of any direct evidence of sex discrimination, as is the case here, district courts apply the *McDonnell Douglas* burden-shifting framework to evaluate such claims. *McDonald v. Newport Hous. Auth.*, No. 3:21-CV-14-DPM, 2023 WL 2837483, at *2 (E.D. Ark. Apr. 7, 2023). Under this analysis, the plaintiff must first establish a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff meets its burden of making a prima facie case, then the burden shifts to the defendant to produce evidence that its employment-related decision was based on a "legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Tex. Dep't*

10

*of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). The defendant's burden is light: it merely has to produce a reason, not persuade the trier of fact, that it was motivated by factors unrelated to the plaintiff's sex. *See id.*

Once the defendant articulates its legitimate reason, the presumption of discrimination that arose from the plaintiff's prima facie case disappears. *See Reeves*, 530 U.S. at 142-43. At the final stage of the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the ultimate burden of showing, through admissible evidence, that the defendant's legitimate, nondiscriminatory reasons were a mere pretext for discrimination. *Id.* at 143. The ultimate burden of persuading the trier of fact that the defendant illegally discriminated rests with the plaintiff. *See Burdine*, 450 U.S. at 253.

NWAH is entitled to judgment as a matter of law on the EEOC's sex discrimination claim because the EEOC cannot establish its prima facie case of discrimination. Namely, the EEOC cannot demonstrate that Chavez suffered any adverse employment action and, additionally, the EEOC failed to identify any similarly situated female employee that NWAH treated more favorably than Chavez.

A.      **The EEOC's Sex Discrimination Claim Fails as a Matter of Law**

To establish a prima facie case of sex discrimination under the *McDonnell Douglas* framework, a plaintiff must demonstrate that: (1) they belong to a protected class; (2) they performed their job satisfactorily; (3) they suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the plaintiff's class more favorably. *Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1062 (8th Cir. 2020). The EEOC cannot establish the third and fourth elements of its prima facie case of sex discrimination and, accordingly, NWAH is entitled to judgment as a matter of law as to the EEOC's sex discrimination claim.

11

### 1.    The EEOC cannot establish a prima facie case of sex discrimination because Chavez did not suffer an adverse employment action.

The EEOC cannot establish the third element of its prima facie case because Chavez did not suffer an adverse employment action.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The words "discriminate against" refer to "differences in treatment that injure" employees. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020). To establish an injury under Title VII, a plaintiff must show the defendant's actions "brought about some 'disadvantageous' change in an employment term or condition." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

And while this resulting injury, often dubbed an "adverse employment action," is defined broadly, "'not everything that makes an employee unhappy is an actionable adverse action.'" *Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015) (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003)). "Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action." *Cruzan v. Special Sch. Dist, No. 1*, 294 F.3d 981, 984 (8th Cir. 2002). And "'[n]ot every setback amounts to an adverse employment action'" either. *Clegg-Mitchell v. Arkansas Dep't of Corr.*, No. 4:06CV01605-WRW, 2007 WL 4548641, at *4 (E.D. Ark. Dec. 18, 2007) (quoting *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074 (8th Cir. 2006)) (finding no adverse employment where management gave plaintiff three written reprimands because plaintiff could not point to a cut in pay, reduction in hours, or any other significant change to the conditions of employment). Adverse employment actions sufficient to establish discrimination "'might include termination, cuts in pay or benefits, and

12

changes that affect an employee's future career prospects but minor changes are not enough.'" *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) (quoting *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)) (citation modified).

Changes to an employee's duties or working conditions resulting in no employment disadvantage "are insufficient to establish the adverse conduct required to" prove discrimination under Title VII. *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). In *Harlston*, the United States Court of Appeals for the Eighth Circuit held that a secretary's reassignment did not constitute an adverse employment action because she "suffered no diminution in her title, salary, or benefits." *Id.* The Eighth Circuit arrived at this conclusion despite the secretary's new position involving fewer secretarial duties and more stress than her previous position. *Id.* These changes describe "nothing 'more disruptive than a mere inconvenience or an alteration of job responsibilities,'" which does not constitute an adverse employment action. *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).

One cannot establish liability under Title VII when the employee "suffered no termination, did not lose pay or benefits, and [their] job duties or responsibilities did not change." *Rester*, 739 F.3d at 1131 (affirming grant of summary judgment to defendant because plaintiff failed to establish an adverse employment action for purposes of sex discrimination claim). Except for circumstances giving rise to a constructive discharge—which is inapplicable to the case at hand because such claim was dismissed—"a plaintiff cannot state an adverse employment action if he voluntarily resigned . . . ." *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003); *accord* (Doc. 48 at 4) (dismissing constructive discharge claim and finding Chavez's exclusion from certain deliveries was not intolerable as a matter of law).

13

Chavez continued to work in the Labor and Delivery unit for more than six months after the Physicians declined his presence in the room during future vaginal deliveries (SMF ¶¶ 65-67, 74). During this period, Chavez experienced no loss in pay, no change in job title or work schedule, and no modification of job duties or responsibilities as a result of the Physicians declining his presence in the room during future vaginal deliveries (SMF ¶¶ 74-81). Chavez maintained his same position, title, normal work schedule, pay rate, and responsibilities, including his presence in deliveries with other physicians in the Labor and Delivery unit (SMF ¶¶ 75-80). The record indeed confirms Chavez's duties remained consistent and he always had plenty of work to perform within his role (SMF ¶¶ 21, 80-81).

He continued to work with at least four other OB-GYNs, who collectively accounted for approximately half of all vaginal deliveries during the relevant period (SMF ¶¶ 75, 109-110). The number of deliveries performed by each OB-GYN fluctuated monthly, meaning any one OB-GYN doctor may have the most deliveries in any one month (SMF ¶¶ 112-114). In fact, Dr. Bearden alone delivered between 15 and 20 vaginal deliveries per month, equating to approximately 119 deliveries over seven months while Chavez worked at NWAH (SMF ¶¶ 112, 114). Thus, Chavez continued to participate in a substantial portion of the unit's deliveries and suffered no lost opportunity (SMF ¶ 115).

The mere fact that two Physicians declined his presence in the room on the days he was working due to his failure to respect their patients' legitimate privacy interests (SMF ¶¶ 30, 64-67) does not constitute an adverse employment action. Minor adjustments in assignments without disadvantage are, as courts repeatedly hold, insufficient. *See Harlston*, 37 F.3d at 382; *see also Cruzan*, 294 F.3d at 984.

14

Finally, Chavez voluntarily resigned his employment after deciding to continue working at another job closer to home and enrolling in an LPN program, citing these reasons for his departure to multiple members of management (SMF ¶¶ 82-90). He left on amicable terms, expressing appreciation for the opportunity (SMF ¶ 83), and never once alleged discrimination or intolerable conditions during his employment (SMF ¶¶ 96). NWAH even tried to get Chavez to stay in the position, but he declined so he could go to school and minimize his commute (SMF ¶¶ 91-92).

The EEOC cannot establish its prima facie case of sex discrimination because, under the undisputed facts, Chavez did not suffer an adverse employment action as a matter of law.

### 2.      *The EEOC cannot establish a prima facie case of sex discrimination because it cannot identify any similarly situated employees outside Chavez's protected class who were treated more favorably.*

The EEOC's failure to demonstrate an adverse employment action wholly defeats its discrimination claim, irrespective of whether it could prove the other elements of its prima facie case. But the EEOC's sex discrimination claim likewise fails for a wholly independent reason: it cannot establish the fourth element of its prima facie case. That is, the EEOC cannot identify any similarly situated employees outside Chavez's protected class who were treated more favorably than he.

The plaintiff maintains the "burden to prove that comparators are in fact similarly situated." *Holston v. City of Hope*, No. 4:17-CV-04005, 2020 WL 60246, at *7 (W.D. Ark. Jan. 6, 2020), *aff'd*, 831 F. App'x 231 (8th Cir. 2020). In *Holston*, the United States District Court for the Western District of Arkansas granted the defendant's motion for summary judgment on plaintiff's gender discrimination claim. *Id.* The court reasoned that the plaintiff "failed to set out facts or evidence that either comparator shared the same supervisor, w[as] subject to the same standards, engaged in the same conduct, held the same or similar positions, had similar tenures, or had similar roles or responsibilities." *Id.*

15

While the test for determining whether a comparator is "similarly situated" is less rigorous at the prima facie stage of this analysis compared with the pretext stage, a plaintiff must nevertheless demonstrate they are similarly situated to their alleged comparators. *See Davis v. Kimbel Mech. Sys., Inc.*, 322 F.R.D. 470, 489 (W.D. Ark. 2017). In *Davis*, this Court (The Hon. Timothy L. Brooks) granted summary judgment as to a plaintiff's gender discrimination claim because the plaintiff failed to identify similarly situated coworkers for purposes of establishing her prima facie case. *Id.* The plaintiff failed to demonstrate evidence suggesting that her workplace duties "significantly overlapped" with the comparators she identified. *Id.* And, further, many of the "would-be comparators had decades of experience, advanced degrees, and technical certifications," which the plaintiff lacked. *Id.*

The United States Court of Appeals for the Eighth Circuit has also opined that, "[g]enerally, part-time employees are not similarly situated to full-time employees." *Johnson v. Univ. of Iowa*, 431 F.3d 325, 330 (8th Cir. 2005) (citing *Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 660 (8th Cir. 2001)) (finding employees were not similarly situated because, most significantly, one was a full-time employee and the other was a part-time employee).

Although the EEOC identifies two alleged comparators, Cameron Shewmaker ("Shewmaker") (a full-time, noncertified surgical technician) and Lancelot (a full-time, certified surgical technician), neither is similarly situated to Chavez. Lancelot held a different position than Chavez as a certified surgical technician (SMF ¶ 101). She came to this position with three years' prior work experience as a certified surgical technician, prior education in a program for her position, and a certification as a surgical technician (SMF ¶¶ 101-105). By comparison, Chavez took no classes and had no education to be a surgical technician, had no formal certification for

16

this position, and had no prior work experience as a certified surgical technician (SMF ¶¶ 12, 15, 108); *accord Davis*, 322 F.R.D. at 489.

Shewmaker held the same position as Chavez as a noncertified surgical technician but, unlike Chavez, Shewmaker worked a full-time schedule (SMF ¶ 98). This schedule allowed her additional training opportunities and operating room assignments, while Chavez, by contrast, was a part-time employee with no prior surgical tech experience who had not worked enough to even be fully trained (SMF ¶¶ 8, 15, 100, 108). Plaintiffs who lack comparable qualifications, training, or job status to those with whom they compare themselves cannot prevail on this element. *See Davis*, 322 F.R.D. at 489; *see also Johnson*, 431 F.3d at 330; *Lowery*, 244 F.3d at 660. The EEOC failed to identify any female employees who had the same background or worked the same schedule as Chavez so neither female can be considered a true comparator to Chavez.

Moreover, the EEOC failed to identify any similarly situated female employees who engaged in comparable conduct to Chavez by failing to respect patient privacy interests but whom NWAH treated more favorably. Specifically, there is no evidence that either Shewmaker or Lancelot was asked to leave a room by a patient and refused to do so or was otherwise making patients uncomfortable through staring at female genitalia, which prompted two doctors to decline working with them going forward.

The EEOC cannot demonstrate that the facts present here "give rise to an inference of sex discrimination" either. *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 (8th Cir. 2007). To the contrary, the Physicians have declined the assistance of both male and female staff in their OB rooms for unprofessional conduct (SMF ¶¶ 116-117). For example, Dr. Beal excluded a female nurse from her deliveries for unprofessional conduct, and Dr. Fry excluded a female nurse, Leslie East, for making inappropriate comments and failing to follow orders (SMF ¶¶ 116-117). At the

17

same time, the Physicians regularly work with male staff, including nurse BJ Wiseman, in their OB rooms (SMF ¶¶ 121-122). The Physicians did not prohibit all males from assisting with their vaginal deliveries but, rather, just Chavez, based on his conduct (SMF ¶ 123).

NWAH's Equal Employment Opportunity policy and Code of Conduct expressly prohibits sex discrimination, and all employees are trained on this policy (SMF ¶¶ 2-5). There is no policy, written or unwritten, that would allow for the exclusion of males from the OB rooms or the operating rooms (SMF ¶ 118). The Physicians both testified that they did not decline Chavez's assistance in their deliveries because of his sex but, rather, because he did not respect their patients' stated privacy concerns and engaged in unprofessional conduct (SMF ¶ 67).

The EEOC's sex discrimination claim accordingly fails because the EEOC cannot identify any similarly situated employees outside Chavez's protected class who were treated more favorably than he. Nor can it establish that the facts of this case give rise to an inference of discrimination.

### 3. *NWAH had legitimate, nondiscriminatory reasons for its actions.*

NWAH is also entitled to summary judgment because it possessed legitimate, nondiscriminatory reasons for any actions it took with respect to all Chavez's employment.

It is well-established that "'federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). "Rather, [the] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Wilking*, 153 F.3d at 873 (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)). Courts "have repeatedly explained that 'it is not our province to decide whether [the employer's] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the'" employer's actions. *Main*, 959 F.3d at 325 (quoting *Wilking*, 153 F.3d at 873).

18

NWAH's practice is to honor patient privacy preferences in labor and delivery, and to decline the assistance of any staff member—regardless of sex—based upon patient preferences, provided safety is not compromised (SMF ¶¶ 30-37, 120). Patient comfort is central to medical care in OB units, particularly given the exposure and vulnerability inherent in childbirth (SMF ¶¶ 30, 37). NWAH consistently assigned staff based on relevant qualifications in line with hospital standards and patient privacy interests (SMF ¶¶ 14-15, 99-100, 105).

Indeed, NWAH has an affirmative obligation under federal law to honor patient privacy requests. Federal regulations provide that "[t]he patient has the right to personal privacy," "[t]he patient has the right to receive care in a safe setting," and "[t]he patient has the right to be free from all forms of abuse or harassment." *See*, 42 C.F.R. § 482.13(c)(1)-(3). The Centers for Medicare & Medicaid Services' State Operations Manual further clarifies that "[p]eople not involved in the care of the patient should not be present during care" without the patient's consent. Appendix A (Hospitals) of the CMS regulations, § 482.13(c)(1), outlines that "a patient has the right to personal privacy."  The Manual specifically states, "The right to personal privacy includes at a minimum, that patients have physical privacy to the extent consistent with their care needs during personal hygiene activities (e.g., toileting, bathing, dressing), during medical/nursing treatments, and when requested as appropriate." *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_a__hospitals.pdf. Accordingly, when Dr. Fry's patient demanded that Chavez leave the room, the patient was not merely complaining—she was asserting her rights under federal law to personal privacy. Under federal law, all patients have a right to privacy over their person, and a person unnecessary to a medical procedure does not have the right to remain against a patient's privacy request. Noncertified surgical technicians like Chavez are not considered medically necessary or essential for vaginal births in the OB room

19

(SMF ¶ 23); thus, NWAH was obligated under 42 C.F.R. § 482.13(c) to honor the patient's privacy request.

The Physicians declined Chavez's assistance during future vaginal deliveries not because of his sex, but because of his unprofessional conduct and failure to respect patient privacy in accordance with federal law (SMF ¶ 67). Chavez did not respect a patient's demand to leave the room and both Physicians observed that Chavez made patients visibly uncomfortable and engaged in conduct described as "very much unprofessional staring" at patients during delivery (SMF ¶¶ 28, 51, 61). Their decision was consistent with their practice of declining the assistance of any staff member—male or female—who fails to uphold professional standards or patient privacy (SMF ¶¶ 67, 116-117). These actions constitute legitimate reasons unrelated to Chavez's sex.

The United States District Court for the Eastern District of Arkansas' opinion in *Baker v. Bd. of Trs. of Univ. of Ark.* is directly on point. No. 4:22-CV-1222 JM, 2025 WL 817468 (E.D. Ark. Mar. 14, 2025). The plaintiff-employee in *Baker*, a male cardiac sonographer, held a supervisory role in the laboratory and provided instruction for diagnostic sonography students. *Id.* at *1. The employee was terminated after the defendant-employer received complaints of unprofessional conduct and behavior that made patients and students uncomfortable. *Id.* at *2. The employee's complained-of conduct included him inviting students into dark rooms to review echocardiograms, touching women on their chests, and overtly seeking out opportunities to assist young female patients. *Id.* at *1-*2.

Although the employee denied this conduct, the court granted the employer's motion for summary judgment on the employee's sex discrimination claim, holding, in part, that the employer proffered a legitimate, nondiscriminatory reason for its decision to terminate the employee. *Id.* at *4. The employer's proffered reasons for its actions—namely, the employee's conduct violated

professional standards and caused discomfort—were sufficient to defeat a claim of sex discrimination. *Id.* The district court arrived at this conclusion even though the employee disputed the allegations and argued that other female employees performed similar tasks. *Id.* The court emphasized that the central question was not whether the employee actually engaged in prohibited conduct, "'but whether the employer believed so in good faith.'" *Id.* (quoting *Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 729-30 (8th Cir. 2019)).

While the case at bar is somewhat distinguishable from *Baker* because Chavez did not suffer an adverse employment action, *Baker* nevertheless lends support to NWAH's actions. Here, as in *Baker*, NWAH had legitimate, nondiscriminatory reasons for allowing the Physicians to decline Chavez's presence in the room during future vaginal deliveries following receipt of a patient's complaint (SMF ¶¶ 54-55, 57-58, 65-67). Dr. Fry personally saw Chavez present in the patient's room, despite the fact that she had informed staff that this patient did not want a male in the room during her delivery (SMF ¶¶ 38-42, 51). Dr. Fry did not know at that point that the patient had previously asked him to leave and he never left the room (SMF ¶¶ 55-56, 58). Once the Physicians received the written complaint explaining Chavez's refusal to adhere to the patient's privacy interests, pursuant to 42 CFR 482.13(c), the Physicians declined to have Chavez present in the room during future vaginal deliveries (SMF ¶¶ 65-66). This decision was consistent with the Physicians' practice of declining the assistance of any staff member—male or female—who fails to uphold professional standards of patient privacy pursuant to 42 CFR 482.13(c) (SMF ¶¶ 67, 116-117).

Patient rights to privacy, safe care, and to be free from abuse and harassment cannot and should not be disregarded in favor of the EEOC's argument of alleged sex discrimination. These actions constitute legitimate reasons unrelated to Chavez's sex, and are precisely the type of

21

business judgment courts will not second-guess absent evidence of intentional discrimination, which does not exist here. *Baker*, 2025 WL 817468 at *5.

### 4.    *The EEOC cannot establish pretext.*

Finally, NWAH is entitled to summary judgment because no evidence exists that supports an inference of pretext or that NWAH's explanations were false or inconsistent. "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012), *cert. denied*, 586 U.S. 885 (2012) (quoting *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)).

"Instances of disparate treatment can support a claim of pretext, but [the plaintiff] has the burden of proving that he and the disparately treated [coworkers] were 'similarly situated in all relevant respects.'" *Harvey*, 38 F.3d at 972 (quoting *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir. 1992)). As predicated by this Court in the *Davis* matter, "unlike at the *prima facie* stage, the test for determining whether a comparator is similarly situated at the pretext stage is much more rigorous." *Davis*, 322 F.R.D. at 488 (citing *Johnson v. Securitas Sec. Serv. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014)); *accord Palesch v. Mo. Comm'n on Hum. Rts.*, 233 F.3d 560, 568 (8th Cir. 2000) (quoting *Harvey*, 38 F.3d at 972) (affirming summary judgment where the plaintiff alleged similarly situated employees were treated differently, but the employees were not similarly situated as a matter of law).

In this case, the EEOC has failed to identify a single comparator who engaged in the same misconduct in which Chavez engaged, violating federal regulations by staring openly and unprofessionally at patients' genitalia while they were laboring and failing to comply with patients' requests for personal privacy under such federal regulations, and thus, the EEOC cannot establish

22

pretext on the basis of disparate treatment. Similarly, the employee in *Baker* "did not produce a single comparator who had been accused of engaging in similar challenged behavior," which tolled a death knell to his sex discrimination claim. 2025 WL 817468, at *5.

While Chavez may disagree with the patient's account that he refused to leave the room, *Baker* further confirms that an employee's disagreement with the employer's assessment of his conduct, or the manner in which a resulting investigation was conducted, does not establish pretext. *Id.* The court emphasized that shortcomings in an investigation do not by themselves support an inference of discrimination, and that the employer's good faith belief in the employee's misconduct is sufficient. *Id.*

There is no allegation or proof that NWAH failed to follow its policies, treated similarly situated employees differently, or shifted explanations. Chavez's experience was the direct result of the Physicians consistently applying professional standards and honoring patient privacy concerns. Specifically, they declined Chavez's presence in the delivery room because of his unprofessional conduct and failure to respect patient privacy in violation of a federal regulation, not because of his sex (SMF ¶¶ 48-52, 60-62, 67). This approach was also applied to female staff, as both Physicians have declined the assistance of female nurses for unprofessional conduct or inappropriate behavior (SMF ¶¶ 116-117).

As explained above, when the patient demanded Chavez leave the room, she was asserting her rights under federal law, specifically 42 C.F.R. § 482.13(c), which provides that patients have a right to personal privacy, to receive care in a safe setting, and to be free from all forms of abuse or harassment. NWAH honored this patient's rights. The EEOC has not demonstrated—and cannot demonstrate—that its regulations on civil rights supersede CMS's regulations on patient rights, and it bears the burden of doing so.

Moreover, the comparator evidence fails under the rigorous standard required here. That is, Shewmaker and Lancelot are not similarly situated to Chavez in all relevant aspects because Shewmaker's full-time status allowed her additional training opportunities and operating room assignments (SMF ¶¶ 97-100), and Lancelot's education, prior work history and certification also made her eligible for work in cesarean section procedures (SMF ¶¶ 101-105). Chavez, by contrast, was a part-time employee, working two shifts per week, with no certification or prior surgical technician experience (SMF ¶¶ 8, 100, 106-108).

The EEOC has not identified any similarly situated female employees who engaged in comparable conduct and were treated more favorably, nor has the EEOC shown that NWAH failed to follow its policies or shifted its explanation. As in *Baker*, the record demonstrates that NWAH's actions were based on legitimate, nondiscriminatory reasons, and the EEOC cannot establish pretext.

The EEOC's sex discrimination claim accordingly fails as a matter of law under the *McDonnell Douglas* burden-shifting framework. NWAH is therefore entitled to judgment as a matter of law as to the EEOC's sex discrimination claim.

## V.  CONCLUSION

For the foregoing reasons, the Court should grant NWAH's motion for summary judgment and dismiss the EEOC's amended complaint in its entirety with prejudice.

Respectfully submitted.

Dated this 20th day of March, 2026.

NORTHWEST ARKANSAS HOSPITALS,
LLC d/b/a NORTHWEST MEDICAL
CENTER-BENTONVILLE, Defendant

*/s/ Gillian G. O'Hara*
Peyton C. Watts, AR 2020165

24

Kutak Rock LLP
1277 East Joyce Blvd., Suite 300
Fayetteville, Arkansas 72703
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
peyton.watts@kutakrock.com

Gillian G. O'Hara (*admitted pro hac vice*)
Robert J. Toth, II (*admitted pro hac vice*)
Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha, NE  68102-2103
(402) 346-6000
(402) 346-1148
gigi.ohara@kutakrock.com
robert.toth@kutakrock.com

25