**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY ) | |
| COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action File No.: 5:24-cv-05195-TLB |
| v. ) | |
| ) | |
| NORTHWEST ARKANSAS HOSPITALS, ) | JURY DEMAND |
| LLC d/b/a NORTHWEST MEDICAL ) | |
| CENTER – BENTONVILLE ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSTION TO DEFEENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

This case concerns egregious sexual discrimination committed by credentialed physicians at Defendant Northwest Arkansas Hospitals, LLC's location known as Northwest Medical Center – Bentonville (NWAH). NWAH had full knowledge of and ratified the discrimination by Drs. Katie Beal (Beal) and Amy Fry (Fry). Beal and Fry's, two credentialed, female physicians at NWAH actively discriminated against Efrin Chavez (Chavez), a male Non-Surgical Technician (Tech).

With the full knowledge of NWAH, Beal and Fry changed Chavez's job duties and responsibilities to a point that they treated him worse than females with respect to his employment terms and overall working conditions. NWAH knew about these changes. Beal and Fry restricted Chavez from assisting in a majority of the non-surgical births in the NWAH Labor and Delivery Unit, one of Chavez's primary duties as a Non-Surgical Technician. NWAH took no action to end Beal and Fry's discriminatory policies. NWAH allowed Beal and Fry's discriminatory policies to

1

continue unabated the remainder of Chavez's employment at NWAH.

NWAH claims to have maintained a sex discrimination policy for its employees. NWAH's Code of Conduct applied this same policy to all NWAH credentialed physicians, including Beal and Fry. Beal and Fry received training on the Code of Conduct when they first became credentialed at NWAH. When NWAH became aware of the violation of its anti-discrimination policy, NWAH decided to allow the discrimination to proceed without any interference. Further, despite NWAH's full knowledge that Beal and Fry had violated the anti-discrimination policy with regard to sex, NWAH never disciplined or otherwise reviewed Beal or Fry's credentialing,.

For these reasons, the Commission disputes many of the Defendant's Statements of Material Fact and provides a summary of the facts in this matter below. As such, the Court should deny Defendant's Motion for Summary Judgment as disputed material facts remain.

## II.  RELEVANT FACTS

During late 2021, NWAH experienced difficulty hiring Surgical Techs. McClain Dep. 14:18-24 (**Exh. A**). As a result of this challenge, the Director of Women's Services, Jennie McClain (McClain), with NWAH's full approval, created a new position, "Non-Surgical Tech," to bring in additional candidates. **Exh. A** at 14:18-20, 14:22-24, 16:1-6, 21:7-9; Sinich Dep. 30(b)(6) at 37:22-38:5 (**Exh. B**). The difference between the two positions was Non-Surgical Techs did not require state certification as did Surgical Techs. Lancelot Dep. at 30:1-9 (**Exh. C**); Eiland Dep. 15:8-16 (**Exh. D**). This is because Non-Surgical Techs do not assist with surgical procedures. **Exh. C** at 54:12-15; **Exh. D** at 15:8-16; Surgical Tech Job Description (**Exh. J**). NWAH always relied upon the Surgical Tech job description for reference as the hospital never created a written job description for Non-Surgical Techs. **Exh. B** 52:17-24.

Chavez accepted the position of Non-Surgical Tech at NWAH on December 7, 2021, with a start date to follow on December 27, 2021. **Exh. A** at 122:8-19; Dkt No. 26, ¶ 15. The primary

reason Chavez applied for this position was to get on the job experience to become a more well-rounded nurse once he obtained his LPN. **Exh. E** at 123:23-124:23. The start date for Chavez was moved to January 10, 2022, and he began working as a Non-Surgical Tech in NWAH's Labor and Delivery Unit (Unit). **Exh. E** at 40:16-18. Chavez was to receive on the job training after hiring. **Exh. C** at 45:6-17, 55:22-56:16, 56:24-57:5; **Exh. E** at 95:5-96:4; Shewmaker Dep. at 28:18-24 (**Exh. F**).

Chavez's responsibilities included preparing the vaginal birthing rooms and assisting with vaginal births in the Unit. **Exh. F** at 29:8-24; **Exh. B** at 52:17-24; **Exh. J**; **Dkt. No.** 26, ¶ 17. This preparation included setting up the tables with instruments, taking patient vitals, placing fetal monitors on patients, cleaning rooms after births, bathing babies, assisting nurses and doctors during deliveries, and taking blood samples to the lab. **Exh. F** at 29:8-24; **Exh. J**; **Dkt. No.** 26, ¶ 19.

The physicians who attend to patients at the facility are not NWAH employees. **Exh. B** at 64:9-66:6; Beal Dep. at 31:15-20 (**Exh. G**); Fry Dep. at 22:18-24, 83:13-19 (**Exh. H**). NWAH individually credentials physicians and requires them to follow the NWAH Code of Conduct. **Exh. B** at 11:14-12:7, 65:19-66:6; 2021 Code of Conduct (**Exh. K**); 2022 Code of Conduct (**Exh. L**). This Code of Conduct includes the same Equal Employment Opportunity policies regarding non-discrimination as those included in the NWAH Employee Handbook. **Exh. B** at 51:11-15; **Exh. J**; **Exh. K** pp. 4-5; **Exh. L** pp. 1-2; Employee Handbook, pp. 14-15, 19 (**Exh. M**). NWAH requires all non-employees providing services at NWAH to complete training and complete an acknowledgment of the Code of Conduct. **Exh. B** at 11:14-16:12, 65:19-66:6; **Exh. G** at 29:7-22; **Exh. K**; **Exh. L**. The NWAH Employee Handbook generally but does not specifically prohibit discrimination based on sex by anyone working or credentialed at NWAH. **Exh. A** at 38:4-7, 13-16, 174:9-21; **Exh. B** at 17:25-18:16, 51:23-52:15; E**xh. L** p. 19. Beal claims she lacked knowledge of NWAH's policy. **Exh. G** at 70:25-71:4; 74:10-13. Fry claims to have never received any training at NWAH regarding

3

sex discrimination but does believe that a policy against sex discrimination exists. **Exh. H** at 22:14-17, 25:6-8.

NWAH policy required Beal and Fry to receive training on NWAH's Code of Conduct when they first became credentialed. **Exh. B** at 11;14-16:12; Exh. K; Exh. L. NWAH primarily dealt with physicians' violations of the Code of Conduct through the bi-annual credentialing process. **Exh. B** at 65:19-66:6; **Exh. G** at 32:13-18, 35:13-16; **Exh. H** at 23:12-24:17; **Exh. K** p. 6; **Exh. L** p. 5. NWAH disciplined neither Beal nor Fry for discriminating against Chavez. **Exh. A** at 40:15-41:4, 79:16-80:5; **Exh. B** at 21:8-22:23, 67:16-23; **Exh. C** at 88:1-3; **Exh. G** at 102:19-103:1; **Exh. H** at 81:3-14.

On January 19, 2022, Beal went to McClain's office to complain about McClain hiring Chavez in the Unit. **Exh. A** at 80:15-22; **Dkt. No.** 26, ¶ 21-26; January 2022 McClain Emails (**Exh. N**). Beal claims this conversation occurred only a week after NWAH hired Chavez. **Exh. G** at 62:11-25. During the conversation, Beal made it clear that McClain should never have hired a male non-surgical tech to work at NWAH without asking her first. **Exh. A** at 22:6-8, 22-24, 81:3-14; **Exh. N**; NWAH Staff Texts (**Exh. R**); **Dkt. No.** 26, ¶ 22.

Beal had personally ensured that no males were hired as Surgical Techs of any kind at NWAH. **Exh. A** at 81:11-14. Beal further stated it was well known that she and Fry only wanted to work with an all-female staff in the Unit. **Exh. A** at 22:12-14, 22-24, 160:14-16; **Exh. C** at 12:15-20, 13:16-22, 38:15-39:9; **Dkt. No.** 26, ¶ 24. Chavez was the only male Non-Surgical Tech at NWAH during his tenure at the hospital and was targeted by Beal and Fry because he was male. **Exh. E** at 118:14-17

NWAH allowed Beal and Fry to make staffing decisions on behalf of NWAH even though they were not Hiring Managers, not part of any NWAH department, and not authorized to do so by NWAH. **Exh. A** at 81:22-25, 87:22-88:3; **Exh. B** at 48:1-9; **Exh. E** at 120:19-121:14, 123:16-17;

**Exh. G** at 15:7-9; **Exh. H** at 13:2-18, 13:22-14:7; **Exh. R**. Both Beal and Fry wanted Chavez barred from patient rooms. **Exh. A** at 23:2-6; **Exh. G** at 66:25-67:6; **Exh. H** at 56:6-18; **Exh. R**. Beal wanted this specifically because Chavez was male. **Exh. A** at 23:2-6. During this conversation, Beal referred to Chavez as "the boy." **Exh. A** at 36:20-37:1. McClain responded to Beal's complaint, stating it likely constituted sex discrimination, as would any actions she took to restrict Chavez in his duties. **Exh. A** at 22:17-21, 23:2-6, 82:11-15; **Exh. N**; **Dkt. No.** 26 ¶ 27.

Upon hearing about the meeting between McClain and Beal, Kimberly Arnold (Arnold), Chief of Nursing at NWAH, texted McClain stating that Beal refusing to allow Chavez to perform his duties in a delivery room based on sex would constitute sex discrimination. **Exh. A** at 22:20-21, 89:23-90:7; **Exh. R**; **Dkt. No.** 26, ¶ 28. Arnold then told McClain to inform NWAH's Compliance, Legal, and Human Resource Departments about what Beal had just told McClain. **Exh. A** at 90:8-16; **Exh. R; Dkt. No.** 26, ¶ 29. Arnold's recommendation conforms to NWAH's corporate policies on reporting discrimination. **Exh. B** at 26:23-28:5.

McClain did as Arnold suggested and contacted Human Resources. **Exh. A** at 25:14-26:5. McClain's complaint regarding Beal's sex discrimination complaint against Chavez was eventually escalated internally. **Exh. A** at 85:14-86:6, 90:12-25; **Exh. N**. NWAH CEO Patrick Kerrwood (Kerrwood) discussed McClain's complaint with her. **Exh. A** at 21:10-11, 90:12-25; **Exh. N**. During this review, it became apparent Beal and Fry were the problem, not Chavez. **Exh. A** at 90:14-19; **Exh. N**. Even though Chavez did not initially recall making a complaint, around this same time, Chavez made a complaint to McClain about the way Beal and Fry were treating him, which added Fry to McClain's complaint. **Exh. A** at 53:9-21, 54:9; **Exh. E** at 105:25-106:4.

NWAH had supposedly established investigatory process for complaints of sex discrimination that it should have followed. **Exh. B** at 75:14-77:25. Other co-workers of Chavez told him they also filed complaints against Beal and Fry regarding their treatment of Chavez and the

5

illegality of it, but these went uninvestigated and unresolved. **Exh. E** at 115:20-116:21, 135:4-136:2. NWAH never informed Beal or Fry of these complaints. **Exh. G** at 18:23-25; **Exh. H** at 16:16-18.

On January 27, 2022, Fry spoke with NWAH staff in the Unit, telling everyone within earshot that she did not approve of a male working in the Unit and males in general should not be present in the Unit. **Exh. A** at 86:7-87:1, 160:14-16; **Exh. C** at 13:16-22, 24:15-25:2; **Exh. G** at 78:23-79:3; **Exh. N**; **Exh. R**. During this rant, Fry did not reference any attempts to restrict female Techs, Surgical or Non-Surgical, from performing their duties in the Unit. **Exh. A** at 86:7-87:1; **Exh. C** at 13:16-22, 24:15-25:2; **Exh. N**; **Exh. R**. In fact, a female Non-Surgical Tech hired in March 2022, Cameron Shewmaker, was allowed to work all births in the Unit. **Exh. A** at 54:25-55:3; **Exh. F** at 12:13-19, 16:17-17:4, 27:15-17. Staff present for Fry's speech believed it was discriminatory against Chavez. **Exh. C** at 32:14-34:3. This speech ensured that Chavez's managers and co-workers at NWAH were now aware of the actions Beal and Fry planned to take against him. **Exh. E** at 122:15-123:11.

By the time NWAH hired Shewmaker, Beal and Fry had restricted Chavez from participating in any births involving Beal or Fry. **Exh. E** at 123:18-124:11; Exh. F at 37:22-38:2. Neither Beal nor Fry ever sought permission from their patients to ban Chavez from providing care in the Unit. **Exh. G** at 91:23-92:1. Beal and Fry also took steps to interfere with Chavez's ability to attend mandatory training at NWAH. **Exh. A** at 27:19-22; 28:2-8; 29:1-4; 31:2-11.

Both Beal and Fry then escalated their actions against Chavez, refusing to allow Chavez to interact with any of their patients. **Exh. A** at 85:2-9; **Exh. E** at 89:10-25; **Exh. N**; **Exh. R**. Beal and Fry did this even though nurses with whom Chavez worked liked him and he had proven himself to be a hard worker. **Exh. A** at 83:23-84:7; **Exh. R**. This restriction resulted in Beal and Fry not allowing Chavez to attend a majority of the non-surgical births at NWAH. **Exh. A** at 54:16-18, 135:15-19. **Exh. G** at 77:12-15, 78:10-19; **Exh. H** at 55:5-9. As  a direct result of Beal and Fry's

actions, Chavez could not carry out his duties as a Non-Surgical Tech for a majority of the births in the Unit. *Id*.; **Exh. E** at 89:10-25; **Exh. J**; **Dkt. No**. 26, ¶ 32-39, 42-43.

On January 26, 2022, one of Fry's patients lodged a complaint regarding whether Chavez had left her room when requested eight days before. **Exh. A** at 75: 9-18, 142: 4-11; **Exh. H** at 26:8-14; Patient Complaint (**Exh. O**). This incident occurred only a few days after Chavez started at NWAH and some staff believed this patient to be Beal and Fry's friend. **Exh. A** at 71:15-19; **Exh. E** at 132:3-9; **Exh. O**. The patient was under an epidural for her delivery but made the complaint as if she was aware of all events occurring around her. **Exh. H** at 43:7-12; 122:2-6. The patient claimed she asked Chavez to leave the room and believed he had done so. **Exh. O**. This part of the incident never happened. **Exh. E** at 132:10-133:2. The patient then reported seeing Chavez in the room after the delivery. **Exh. O**. Fry claims Chavez was staring at the patient's vaginal area while waiting for the placenta to be delivered. **Exh. H** at 39:6-13, 40:3-8, 102:10-13. This type of attention while awaiting the delivery of the placenta is a normal part of the delivery process and signals the end of the entire delivery. **Exh. C** at 74:14-75:1; 80:22-81:1. This part of the birthing process was one of the duties of Chavez's job that he was expected to learn via experience. **Exh. C** at 45:6-17, 55:22-56:16, 56:24-57:5; **Exh. F** at 28:18-24; **Exh. J**.

NWAH investigated the patient's claim. **Exh. A** at 48:17-25; **Exh. O**; Internal Emails about Patient Complaint (**Exh. P**). NWAH found Chavez had only entered the room once and left the room once based on its staff badge tracking system. **Exh. A** at 65:9-17, 71:8-13, 143:21-25; NWAH Letter to Patient (**Exh. Q**). Also, Chavez's coworkers reported he never entered any patient's room without permission. **Exh. A** at 73:16-23. Chavez never remained in a room when he was asked to leave. **Exh. A** at 76:8-11. The patient never made any complaint to Chavez about his presence in the room. **Exh. E** at 126:15-19. As such, NWAH found the patient's complaint without merit and did not discipline Chavez**. Exh. B** at 74:23-75:3; Exh. Q. NWAH never even told Chavez about this patient complaint.

**Exh. E** at 125:16-19. Fry attempted to use the patient complaint and the subsequent investigation as an explanation for her ongoing sex discrimination against Chavez. Fry Email to NWAH (**Exh. O.**).

Beal and Fry both claim the staff badge tracking system does not always work properly. **Exh. G** at 38:10-39:18, 52:8-53:5, 115:23-117:2; **Exh. H** at 46:6-21. NWAH refused to provide testimony on the status of the tracking system and McClain represented that she lacked knowledge of any issues with the staff badge tracking system. **Exh. A** at 74:2-23, 144:13-23; **Exh. B** 59:14-60:2. Further, the system specifically includes lights above the doors to physically indicate when staff are present or absent from a room. **Exh. A** at 74:2-23, 144:13-23; Bearden Dep. at 23:19-24:9 (**Exh. I**).

At this point NWAH CEO Kerrwood told McClain he had escalated the discrimination concerns to the hospital's parent company, Community Health Systems, Inc. of Franklin, Tennessee (CHS). **Exh. A** at 90:14-25. Kerrwood told McClain the outcome of the escalation was CHS and NWAH would take no action against Beal or Fry related to their actions against Chavez. **Exh. A** at 171:3-11. Kerrwood made it clear to McClain this was the final word on the topic. *Id.*

NWAH needed to maintain Beal and Fry as physicians at the hospital because they performed a majority of the deliveries. **Exh. A** at 57:3-6, 186:13-25; **Exh. G** at 77:12-15. The hospital could not risk offending Beal and Fry by enforcing its policies as Beal and Fry might leave NWAH. *Id.* NWAH wanted to maintain the cashflow from deliveries. **Exh. A** at 57:7-58:13, 59:6-8; 60:21-24. With regard to Chavez, NWAH failed to comply with its own supposed EEO policy. **Exh. A** at 186:7-12; **Exh. C** at 37:12-38:4; **Exh. E** at 114:13-19, 119:6-120:4; **Exh. M** pp. 14-15, 19.

Beal and Fry continued preventing Chavez from doing many of his assigned duties in the Unit even on days when they were the only doctors on the Unit. **Exh. C** at 37:12-38:4; **Exh. E** at 105:6-105:12; **Exh. J**. As a result of the actions of Beal and Fry, they forced Chavez to perform other menial tasks during his shifts such as stocking rooms in the Unit, stocking the floor, scanning gauzes, and setting up and breaking down tables before and after deliveries. **Exh. E** at 58:5-10; **Exh.**

**G** at 114:17-22. He would perform these duties while females assisted with non-surgical births in the Unit. **Exh. A** at 54:25-55:3; **Exh. F** at 16:17-17:4, 19:11-17. As a result of these restrictions on his job duties, Chavez became dejected. **Exh. A** at 55:17-56:3. Beal and Fry prevented Chavez from receiving the desired experience that originally motivated him to seek the job at NWAH; namely, to learn more about obstetrics and the birthing process to become a more well-rounded healthcare professional in his future career as an LPN. **Exh. E** at 124:9-23. This is what Beal and Fry had always intended. **Exh. O**.

Due to the actions of Beal and Fry, denying Chavez the ability to get the experience he needed to become a well-rounded LPN, and relegating him to performing primarily menial tasks during his shifts, Chavez resigned from NWAH. **Exh. A** at 56:14-15, 22-23, 185:4-12; **Exh. E** at 104:19-105:5, 113:14-114:11, 123:23-124:23; **Exh. F** at 16:20-18:22.

### III. ARGUMENT AND LAW

#### A.  The Commission Has Established a Triable Issue on Sex Discrimination

Defendant correctly stated the summary judgment standard in its brief.

But Defendant is not entitled to summary judgment because a genuine issue of material fact exists as to whether NWAH subjected Chavez to sex discrimination. The record shows NWAH subjected Chavez to sex discrimination and NWAH tried to defend the discrimination as something its credentialed physicians were allowed to do even though it violated the EEO policy. The record shows that NWAH took no action whatsoever to stop the discriminatory actions against Chavez and allowed the discrimination to continue for almost the entirety of Chavez's employment with the hospital in violation of the sex discrimination policy and Code of Conduct.

Title VII prohibits employment discrimination based on sex and covers a broad spectrum of disparate treatment. *Sandoval v. Am. Bldg. Maint. Indus.*, 578 F.3d 787, 801 (8th Cir. 2009) (citing 42 U.S.C. § 2000e-2; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Specifically, "Title VII

makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.'" *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 350 (2024) (quoting 42 U.S.C. § 2000e-2(a)(1)).

To make out a *prima facie* case of discrimination under Title VII, a plaintiff must show he: "(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; [and] (3) suffered an adverse employment action; ... (4) under circumstances permitting 'an inference of discrimination.'" *Parker v. U.S. Dept. of Agriculture*, 129 F.4th 1104, 1111-12 (8th Cir. 2025) (quoting *Clegg v. Ark. Dept. of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) (abrogated on other grounds by *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110 (8th Cir. 2024)). Only after this burden is met does the burden shift to the employer of "articulating a legitimate, nondiscriminatory reason for the adverse employment action." *Parker*, 129 F.4th at 1112 (quoting *Heisler v. Nationwide Mutual Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019)).

To show that an adverse employment action occurred, a plaintiff must be able to show there was some sort of "disadvantageous" change in an employment term or condition. *Muldrow* 601 U.S. at 354 (citing *Oncale* v. *Sundowner Offshore Serv. Inc.*, 523 U.S. 75 (1998) (quoting *Harris v. Forklift System, Inc.*, 510 U.S. 17, 23 (1993))). Further, the concept of "discriminating against" someone refers to "differences in treatment that injure" an employee. *Muldrow* 601 U.S. at 354 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020). Finally, with regard to showing the "terms and conditions" that may be affected by an employer's discriminatory actions, terms and conditions are "not used 'in the narrow contractual sense'; it covers more than the 'economic or tangible.'" *Muldrow* 601 U.S. at 354 (quoting *Oncale* 523 U.S. at 78; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). The plaintiff must also show "some harm respecting an identifiable term or condition of employment." *Muldrow* 601 U.S. at 354-55. This harm need not be significant,

10

serious, or substantial. *Muldrow* 601 U.S. at 355. The harm need merely be "some injury respecting her employment terms or conditions." *Muldrow* 601 U.S. at 359.

### 1. NWAH does not contest Chavez is a member of a protected class and he met legitimate expectations.

NWAH has only contested whether Chavez suffered an adverse employment action and whether the circumstances under which the adverse action was taken against Chavez permit an inference of discrimination. As such, the Commission will not address the first two prongs.

### 2. Chavez suffered an adverse employment action.

To show that an adverse employment action occurred, a plaintiff must be able to show there was some sort of "disadvantageous" change in an employment term or condition. *Muldrow* 601 U.S. at 354 (citing *Oncale* v. *Sundowner Offshore Serv. Inc.*, 523 U.S. 75 (1998) (quoting *Harris v. Forklift System, Inc.*, 510 U.S. 17, 23 (1993)). Finally, as we are directed in *Muldrow,* we are not to construe "terms and conditions" narrowly and to consider harm that is merely an injury related to employment terms and conditions. *Muldrow* 601 U.S. at 354-55, 359.

As a Non-Surgical Tech, Chavez's duties related to patient care included taking patient vitals, placing fetal monitors on patients, cleaning rooms after births, bathing babies, assisting nurses and doctors during deliveries, and taking blood samples to the lab. Chavez's duties unrelated to patient care included stocking rooms in the Unit, stocking the Unit floor, setting up tables with instruments, and breaking down tables before and after deliveries. Shortly after starting work for NWAH, Beal and Fry barred Chavez from carrying out any of his duties related to patient care for their patients. This was a major change in Chavez's overall duties as Beal and Fry delivered a majority of the non-surgical births during the time Chavez worked for NWAH. As such, most of the time he was on duty, Chavez was not allowed to participate in a significant portion of his job responsibilities other than menial tasks that were not patient related.

NWAH and Chavez agree the conditions and privileges of work changed during Chavez's employment at the hospital. NWAH claims these changes were merely administrative and had nothing to do with his sex even though Chavez was the only male working on the Unit. Because NWAH endorsed Beal and Fry's discrimination against Chavez – prohibiting him from participating in a majority of the births and associated patient care on the Unit - Chavez's employment terms and conditions as a Non-Surgical Tech were identifiably altered.

### 3. NWAH's actions against Chavez constituted an inference of discrimination.

The concept of "discriminating against" someone refers to "differences in treatment that injure" an employee. *Muldrow* 601 U.S. at 354 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020)).

Chavez was the only male working on the Unit as a Non-Surgical Tech. NWAH did not bar females techs from participating in births and associated patient care. NWAH's given reasons for discriminating against Chavez are nonsensical in that they call into question basic duties of his position and paint him generally as a problematic employee. Notably, even after taking NWAH's arguments into consideration, the hospital points out it never terminated Chavez's employment after making an argument that it could or should have.

NWAH allowed Beal and Fry to publicly take actions to bar Chavez from performing his duties. Further, Beal and Fry made it clear publicly that they would no longer allow Chavez to perform these duties for their patients and thus ostracized him from his fellow co-workers while they continued to allow females in the same position to carry out all their duties. Finally, NWAH ratified all of the actions of Beal and Fry after other employees warned that the hospital's action constituted discrimination. In the end, NWAH chose profit over protecting the right of Chavez to work in an environment free of discrimination.

12

**4. NWAH's Sexual Discrimination Policies Were Inadequate in Practice.**

Although Defendants maintained facially adequate EEO and anti-discrimination policies, the record reveals NWAH did not meaningfully implement those policies or enforce them in a manner that could have ever protected Chavez. Sinich, NWAH's 30(b)(6) witness, provided a full description of how the EEO and anti-discrimination policies were to be disseminated and enforced across both employees and non-employees. According to Sinich, even credentialed physicians like Beal and Fry were required to follow these policies under the NWAH Code of Conduct.

Under oath, only some former employees could provide testimony supporting Sinich's claims. None of the physicians could recall having been trained on the NWAH Code of Conduct or the NWAH Employee Handbook. In reality, NWAH's anti-discrimination policies seem to be written policies known to a few employees from an initial training with no refreshers thereafter. The Code of Conduct is virtually unknown to credentialed physicians, with neither Beal nor Fry remembering going through any training on this supposed code. The ignorance of this code was so complete that both Beal and Fry openly engaged in discriminatory conduct that NWAH fully ratified and condoned, with no corrective action ever taken. Even CEO Kerrwood was uncertain of how to apply the NWAH EEO policy to Beal and Fry's actions, ultimately allowing the discrimination against Chavez to continue unabated.

The record lacks any evidence that NWAH's procedures included any type of refresher courses on the EEO policies or the Code of Conduct for any employee or credentialed physician. Likewise, there is no evidence supervisors received any type of specific training to recognize or report incidents of sexual discrimination. McClain testified she only made her initial report about Beal and Fry's discriminatory actions after consulting with Arnold to ensure McClain knew how to effectively communicate the complaint. This failure deprived everyone at NWAH of understanding of how the policies were to be enforced and deprived employees of the protections these policies

should have provided.

NWAH was negligent in controlling Chavez's work environment. This negligence resulted in NWAH depriving Chavez of all the protection NWAH should have afforded him under the EEO and anti-discrimination policies. On each shift he worked, Chavez endured open and hostile discrimination and isolation. NWAH failed to comply with its own policies of training and holding credentialed physicians to the standards of this policy via the Code of Conduct.

Although NWAH has outlined a means by which to educate credentialed physicians how to avoid violating NWAH's sex discrimination policy, the hospital has utterly failed in its execution. There is no evidence showing NWAH ever actually trained Beal or Fry on the policies or the Code of Conduct. Neither Beal nor Fry recall ever receiving any training on NWAH's discrimination policies.

NWAH has also outlined a means by which employees can report discrimination for investigation, yet no investigation took place when employee made complaints about Beal and Fry violating the sex discrimination policy. The investigatory process failed so completely that, even though NWAH does not deny knowledge of the discriminatory actions by Beal and Fry, the hospital allowed the physicians to continue violating the policy as they saw fit. This resulted in NWAH subjecting Chavez to ongoing sex discrimination for the remainder of his employment at NWAH.

Here, NWAH employed Chavez while knowing Beal and Fry subjected him to discrimination based on his sex. At no time did NWAH ensure that its physicians followed its own policies under its Code of Conduct. NWAH had an obligation to make certain that Beal and Fry knew about NWAH's sex discrimination policy, understood the policy, and did not violate it. Further, NWAH had a duty to ensure Beal and Fry stopped discriminating against Chavez once NWAH became aware of the discrimination.

Thus, NWAH is negligent and liable, and the Commission meets its burden to establish its

14

prima facia case of sexual discrimination in the workplace.

## IV. CONCLUSION

The Commission has raised genuine issues of material fact sufficient to defeat summary judgment on all claims. The Court should deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

**FAYE A. WILLIAMS**
Regional Attorney
TN Bar No. 011730

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
200 Jefferson Avenue, Suite 1400
Memphis, TN 38103
Telephone: (901) 685-4609

**GARY SULLIVAN**
Assistant Regional Attorney
AR Bar No. 92051
gary.sullivan@eeoc.gov

*/s/ James Monroe Scurlock*
**JAMES MONROE SCURLOCK**
Trial Attorney
AR Bar No. 2012028
james.scurlock@eeoc.gov

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
820 Louisiana St., Ste. 200
Little Rock, AR 72201
Telephone: (501) 900-6148