**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**            **PLAINTIFF**

**V.**                    **CASE NO. 5:24-CV-5195**

**NORTHWEST ARKANSAS HOSPITALS, LLC**
**d/b/a NORTHWEST MEDICAL CENTER-BENTONVILLE**            **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendant Northwest Arkansas Hospitals, LLC's Motion for Summary Judgment (Doc. 56), which Plaintiff Equal Employment Opportunity Commission ("EEOC") opposes.[1] EEOC brings a single claim of sex discrimination under Title VII on behalf of Efrin Chavez against Northwest Arkansas Hospitals ("NWAH" or the "Hospital"). Chavez was employed in the Hospital's labor and delivery unit and claims he was discriminated against because two doctors refused his assistance with their patients' vaginal deliveries. For the reasons that follow, the Motion (Doc. 56) is **DENIED**.

**I. LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999) (quoting Fed. R. Civ. P. 56). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict

---

[1] The Court has also reviewed the parties' statements of fact (Docs. 58 & 65), various briefs in support or opposition (Docs. 57, 63, 66, 69 & 72), and attached documents.

for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

"To be material, a fact must 'affect the outcome of the suit under the governing law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient' to survive summary judgment." *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby*, 477 U.S. at 252). The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Court must base its determination of whether a genuine issue of material fact exists on "evidence that will be admissible at trial. [T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (alteration in original) (internal quotations and citations omitted).

## II. FACTUAL BACKGROUND

In its response to NWAH's Statement of Facts (Doc. 65), EEOC denies many of the Hospital's material facts, sometimes providing citations to support such denials. It also frequently admits a fact "only to the extent the physician made this claim," without denying any aspect of the stated fact or citing any contravening evidence. The Eighth Circuit has repeatedly stated that "in opposing a motion for summary judgment, a nonmoving party

may not rely on mere denials or allegations in its pleadings, but must designate specific facts showing that there is a genuine issue for trial." *Hernandez v. Jarman*, 340 F.3d 617, 622 (8th Cir. 2003). Some of EEOC's denials also rely on inadmissible hearsay for which EEOC has offered no exception. The following facts are found uncontroverted based on EEOC's failure to present contradictory evidence that could be presented in an admissible form at trial. The disputed facts are discussed afterward.

### A. Undisputed Facts

Chavez was hired by Northwest Arkansas Hospitals ("NWAH") as a part-time, noncertified surgical technician in the labor and delivery unit in December of 2021. (Doc. 65, ¶¶ 1, 8). His first day at NWAH was January 10, 2022. (Doc. 63-5, p. 40:16–18 (Chavez Dep.)). Chavez's manager was Jennie McClain ("McClain"), NWAH's then-Director of Women's Services. (Doc. 65, ¶ 9). He had no prior experience as a surgical technician when he started at NWAH. *Id.* ¶ 15. NWAH had never hired a noncertified surgical technician in labor and delivery before but opened the position after it was unable to fill a certified surgical technician position. (Doc. 63-1, p. 14:18-24 (McClain Dep.)). Chavez was the first and only noncertified surgical technician in labor and delivery until Cameron Shewmaker was hired later in the year. (Doc. 63-6, p. 12:1–13 (Shewmaker Dep.)).

At NWAH, noncertified surgical technicians assisted with vaginal deliveries in the obstetrics ("OB") room, and certified surgical technicians assisted with both vaginal deliveries in the OB room and cesarean sections in the operating room. (Doc. 65, ¶¶ 11, 13). Noncertified surgical technicians performed a variety of tasks including but not limited to prepping the room before deliveries ("stocking supplies, setting up instruments, and preparing tables"), assisting during deliveries ("handing instruments, gathering items to

assist the OB-GYN, and collecting blood samples from the patient for lab testing"), and cleaning up after deliveries ("account[ing] for and clean[ing] the instruments, and prepar[ing] for subsequent deliveries"). *Id.* ¶¶ 17–19. Noncertified surgical technicians are not considered medically necessary for vaginal deliveries. *Id.* ¶ 23. Outside deliveries, noncertified surgical technicians also assisted with postpartum care "such as monitoring and recording room temperatures, completing patient paperwork, putting together care packages, bathing newborns, and recording vitals." *Id.* ¶ 20.

During a vaginal delivery, a laboring mother is partially disrobed with her legs in stirrups, leaving her vagina, perineum, and anus exposed. *Id.* ¶ 24. "Many patients are uncomfortable with the presence of non-essential male staff in the OB room during vaginal deliveries."[2] *Id.* ¶ 30. However, "NWAH has male OB-GYNs, anesthesiologists, nurses, CRNAs, circulator nurses, food service workers, respiratory therapists, and neonatologists regularly performing tasks in OB rooms concerning vaginal deliveries." *Id.* ¶ 119. Where safety is not a factor, "OB-GYNs do everything they can to honor patient privacy interests" including by excluding male employees and providers from the OB room, and they "customarily consult with patients before delivery to confirm their preferences for staffing." *Id.* ¶ 31–32. "Nonmedical providers, like McClain, do not participate in these conversations." *Id.* ¶ 33. Physicians will "then discuss patient preferences with NWAH staff and communicate when patients have preferences for any non-essential staff—male or female—to be excluded from the delivery room." *Id.* ¶ 36.

---

[2] EEOC asserts that "many" is too many. The Court will not indulge this semantic distinction as a basis for denying a well-supported fact.

The doctors in labor and delivery at the Hospital have admitting privileges but are not Hospital employees. The Hospital does, however, provide the support staff, like nurses and surgical technicians, needed to run the labor and delivery unit. The two physicians whose conduct is at issue in this litigation, Drs. Katie Beal and Amy Fry, included male hospital employees in their vaginal deliveries when patients did not object or when their inclusion was medically necessary. *Id.* ¶ 120–23. On the other hand, the doctors had previously excluded female nurses from their deliveries for unprofessional conduct or failing to follow orders. *Id.* ¶ 116–17.

While Chavez was exposed to female genitalia through his work, he denied "ever assist[ing] in visually assessing the progress of labor" and testified that he had "[v]ery little" exposure to patients' genitalia in the OB room because he "would stand laterally to, like, the head of the patient" and was "usually . . . facing the provider" when he would come around to a patient's feet. (Doc. 63-5, pp. 58:18–59:22 (Chavez Dep.)).

Shortly after Chavez started Drs. Beal and Fry barred Chavez from participating in their patients' deliveries. *Id.* ¶ 66. "Chavez stared at patients during deliveries to the point of making them uncomfortable." *Id.* ¶ 28.[3] Drs. Fry and Beal own an obstetrics practice together and jointly manage their patients, so they decided together to exclude him from their deliveries. *Id.* ¶¶ 59, 64, 66. The date on which this ban was instituted is disputed, and EEOC also claims that Chavez was excluded because he is male, not because he stared at patients to the point of making them uncomfortable. *See infra* pp. 9–11.

---

[3] EEOC denies this fact without evidence while simultaneously and contradictorily arguing that Chavez was actually supposed to be staring at patients' genitalia.

The first incident occurred on January 18, 2022, when one of Dr. Fry's long-time patients was scheduled for an induction. *Id.* ¶ 38. Dr. Fry had delivered this patient's two previous children and knew that the patient did not want any men assisting in her delivery. *Id.* ¶¶ 39–40. Dr. Fry learned that morning that NWAH had hired a male surgical technician and informed the nursing staff that he would not be able to participate in this delivery because of the patient's privacy interests. *Id.* ¶ 42. Chavez nonetheless entered the patient's room and was directed to leave which he, at some point, did. (Doc. 63-5, pp. 77:22–78:6 (Chavez Dep.)). The sequence of events surrounding his removal is disputed, his presence in the room and removal therefrom are not. *See infra* pp. 11–12.

On January 26, 2022, the patient submitted a written complaint about her experience with Chavez. She stated that Chavez had "not ask[ed] permission" before entering the room and "never left and stayed there during [her] whole delivery" after she "asked the nurse to have him leave." (Doc. 63-15). The complaint was the first Dr. Fry had heard about Chavez ignoring a patient's request that he be removed. (Doc. 65, ¶ 56). Dr. Fry forwarded the complaint to NWAH's Market Risk Coordinator, Rebecca Olson, with the following message:

> My partner, Dr. Beal and I voiced our concerns with our Labor and delivery director that there were going to be many complaints from our patients regarding the hiring of a 19 year old male who would be present in vaginal deliveries and participate in care with newly delivered mothers.
>
> Our concerns were dismissed as "sexual discrimination" however there was no thought given to the comfort and respect we should provide to our female patients. Here is the first of many complaints that I expect will roll into your office in the future.

(Doc. 63-15). NWAH investigated and dismissed the complaint because its "badge tracking system" registered Chavez's badge in the OB room "one time." (Doc. 64). Therefore, the Hospital concluded that "[o]nce [the patient] expressed concern with the

male tech, he did not enter into [her] room again." *Id.* The patient stopped seeing Dr. Fry after this experience. (Doc. 63-8, p. 105:9–17 (Fry Dep.)). Chavez was never disciplined by NWAH for the conduct described in the complaint. (Doc. 63-5, p. 127:8–11 (Chavez Dep.)).

Dr. Beal had a similar experience. "On January 19, 2022, Dr. Beal was performing a vaginal delivery at NWAH when she noticed her 'patient was very visibly uncomfortable' and 'looking over [Dr. Beal's] right shoulder at [Chavez], holding her knees together, very uncomfortable with his presence.'" *Id.* ¶ 59 (alterations in original) (quoting Doc. 63-7, pp. 63:13-64:3 (Beal Dep.))). "Chavez 'was seen in the back of the room just staring at her genitalia. He wasn't providing help, support, holding a leg, handing instruments. It was very much unprofessional staring.'" *Id.* ¶ 61. "When Dr. Beal noticed her patient's reaction to Chavez's presence in her delivery, Dr. Beal asked him to leave." *Id.* ¶ 62. EEOC does not dispute that this happened, but maintains, contrary to Chavez's testimony, that it was his job to stare at the patient's genitalia.

Chavez was asked to leave the OB room on at least a few other occasions. *Id.* ¶ 70–72.  He was also asked to leave a postpartum room where he had entered while the patient was breastfeeding. *Id.* ¶ 73.

On January 20,[4] Dr. Beal went to McClain's office to talk about Chavez. The contents of this conversation are disputed. *See infra* pp. 10. McClain immediately alerted Chief Nursing Officer Kimberly Arnold, Human Resources Director Melissa Kugel, and Market Risk Coordinator Rebecca Olson about the conversation because she was

---

[4] EEOC represents that this conversation took place January 19. McClain did not testify to a particular date on which this conversation occurred, but she sent an email to Kugel on January 20 which stated that Dr. Beal came to her office "[t]his morning." (Doc. 63-14).

concerned about sex discrimination. (Doc. 63-14; Doc. 63-1, p. 22:17-21 (McClain Dep.)). Arnold reported back that she had discussed the matter with Patrick Kerrwood, the Hospital's CEO. (Doc. 63-14). If an internal investigation was conducted, Drs. Beal and Fry were not made aware of it, nor were they disciplined. (Doc. 63-7, p. 18:23–25 (Beal Dep.); Doc. 63-8, p. 16:16–18 (Fry Dep.)).

Cassidy Lancelot, a certified surgical technician who sometimes worked with Chavez, testified that, at some point, she also heard Dr. Fry tell those gathered at the nurses' station "specifically that she didn't want a male in rooms, that she prided herself on telling her patients that they would only see females." (Doc. 63-3, p. 12:16–20 (Lancelot Dep.)). Lancelot understood these statements to mean "[t]hat she didn't want Efrin [Chavez] in her room." *Id.* at pp. 24:15–25:2.[5] Based on McClain's subsequent emails to management, Dr. Fry's statements likely occurred on January 27, the day after the patient complaint was received. (Doc. 63-14).

Chavez remained at NWAH for another six months until his resignation in July 2022. (Doc. 65, ¶ 74). He assisted in vaginal deliveries for the other OB-GYNs at NWAH. *Id.* ¶ 75. Chavez was not allowed to assist with the roughly half of vaginal deliveries

---

[5] EEOC also relies in its briefing on emails and text messages between McClain, Arnold, and others about statements Drs. Beal and Fry purportedly made. These emails and text messages constitute hearsay within hearsay; while individuals who actually heard the alleged statements may be able to *testify* to their contents, EEOC has identified no exception under which these written statements can be offered to prove that the oral statements they purport to recount were, in fact, made. EEOC failed to present deposition testimony or affidavits from Keilia Kelly, Kimberly Arnold, Angie Markey, or Jenna Tolbert (the various authors of the statements about the statements) and has therefore failed to "demonstrate that the evidence may be offered at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d at 485. "Foundation" and "authentication" are not hearsay exceptions. These portions of EEOC's Exhibits N and R (Docs. 63-14 & 63-17) cannot be relied on to create a genuine factual dispute.

performed by Drs. Beal and Fry. *Id.* ¶ 109. In Chavez's view, this restriction "prevented him from being able to do [his] full list of duties that [he] was hired to do" and he was "not allowed . . . to get experience in a field that [he] thought would be a value to [him] as [he] continued on in the nursing field." (Doc. 63-5, p. 124:2–23 (Chavez Dep.)).

Chavez emailed his supervisors McClain and Kelly his two weeks' notice resigning from his position at NWAH on July 7, 2022. (Doc. 56-1, p. 41). In the email he stated "I have enjoyed my time here and I appreciate the opportunity you have given me to be a part of this team." *Id.* [6] After sending his notice, he spoke to McClain and told her he was resigning because his other job was closer to home and had a shorter commute and he would be starting a full time licensed practical nursing program soon. (Doc. 65, ¶ 84).[7] He told the same to Arnold. *Id.* ¶ 90. Chavez also testified that what he told McClain and Arnold was true; he was planning to (and did) go to school for an LPN program, and his other job at Arkansas Children's Hospital was a shorter commute. (Doc. 63-5, pp. 30:4–31:10 (Chavez Dep.)). He did not report sex discrimination as a reason for his resignation.

### B.  Disputed Facts

The primary disputes in this litigation concern when and why Drs. Beal and Fry excluded Chavez from their deliveries, and if NWAH shared the doctors' understanding of the reason for the ban.

EEOC asserts, based on McClain's testimony, that Drs. Beal and Fry began excluding Chavez immediately when he started. But the cited portion of her testimony

---

[6] Chavez's email, offered by NWAH, is a statement by a party opponent and therefore definitional nonhearsay.

[7] EEOC denies that these were Chavez's only reasons for resigning, but does not deny that these were the only reasons communicated to McClain or anyone else at NWAH prior to this litigation. None of the testimony cited by EEOC is to the contrary.

says nothing about the date on which the exclusion began. *See* Doc. 65, ¶ 65; Doc. 63-1, p. 23:2–6 (McClain Dep.) ("Q: When you told her [Beal] about your concerns about discrimination, what was it your understanding that the discrimination was in this situation? A: Well, I felt like she didn't want him to be a part of a patient[']s care because he was a male."). NWAH asserts, based on Drs. Beal and Fry's testimony, that the doctors started excluding him after receiving the patient complaint on January 26. (Doc. 63-8, p. 55:20–24 (Fry Dep.); Doc. 63-7, pp. 111:14–112:15 (Beal Dep.)).

In its briefing, EEOC does discuss a conversation that took place January 20 between McClain and Dr. Beal which may support the pre-January 26 exclusion to which EEOC refers. According to McClain, "[t]here was a day not long after [she] hired Efrin that Dr. Beal came to [her] office and was very angry, and told [her] [she] should have asked her before [she] hired him that they had an all-man[8] staff for a reason, and that they didn't want him even doing vital signs on their patients." (Doc. 63-1, p. 22:6–10 (McClain Dep.)). Dr. Beal told her they "have to have an all female staff because the majority of our patients are sexual assault victims." *Id.* at p. 22:12–14. McClain did not believe her ("[W]hy is Bentonville the sexual assault capital of the world, I find that very difficult to believe.") and told her she needed "to be careful here because this could be considered sexual discrimination." *Id.* at p. 22:14–21.

Dr. Beal remembers this conversation differently. She testified that she voiced her concern with "patient privacy and consent and that [they] had no process for that to assure that patient's privacy was being acknowledged and honored." (Doc. 63-7, p. 40:8–17 (Beal Dep.)). McClain responded "that privacy was not a concern and that to engage in

---

[8] McClain later clarified that she meant all female. *Id.* at pp. 22:22–23:1.

patient consent and privacy was akin to sexual discrimination." *Id.* at p. 40:18–20. Dr. Beal denied barring Chavez from her deliveries in this conversation and said she "requested that we obtain consent from the patient for him to participate in their care as a noncertified surgical scrub tech." *Id.* at p. 41:4–6. Dr. Beal never requested a particular consent process with respect to any particular female employee. *Id.* at p. 43:6–10.

Chavez's testimony suggests that he was permitted in Drs. Beal and Fry's deliveries for at least some period of time. Although EEOC does not point the Court to Chavez's testimony about the date on which he was first excluded (if such testimony exists), he testified that he initially assisted in "anywhere from two, two to five" deliveries per shift," but toward the middle of his tenure, "depend[ing] on which providers were on the schedule, . . . it got closer to maybe one or two." (Doc. 63-5, p. 60:10–24 (Chavez Dep.)). EEOC does not dispute that Chavez was permitted in the OB room with Dr. Beal on January 19 up until she noticed her patient's discomfort and asked him to leave. (Doc. 65, ¶¶ 59–62).

Why Drs. Beal and Fry decided to wholly excluded Chavez from their deliveries is, of course, also disputed. NWAH says it was because of Chavez's unprofessional conduct, particularly the January 18 delivery resulting in the January 26 patient complaint. The parties offer two different versions of the January 18 delivery—but both versions have inconsistencies. On EEOC's account, Chavez was in the OB room throughout the patient's labor and delivery until such point as Dr. Fry prompted his departure—the patient never complained at all. (Doc. 63, p. 7 (citation omitted)). This is difficult to square with the undisputed evidence that the patient wanted no male employees in the delivery room and that Dr. Fry told the nursing staff first thing in the morning that Chavez would not be

11

allowed into the room. (Doc. 65, ¶¶ 40–42). It is even more difficult to square with Chavez's own testimony:

> Q: The patient then expressed concern about your presence in the delivery room, correct?
>
> A: Yes.
>
> Q: And the patient then asked one of the nurses in the room to have you excluded from her delivery, correct?
>
> A: Correct.

(Doc. 63-5, p. 78:1–6 (Chavez Dep.)).

NWAH, by contrast, asserts that Chavez was in the room, the patient asked for him to be removed, and he either remained in or reentered the room against the patient's wishes until Dr. Fry removed him. It seems clear that Dr. Fry believed this is what happened. It is not clear, however, that NWAH shared her belief. It is difficult to square the version of events NWAH now presents to the Court with the results of its own investigation, which entirely dismissed the patient's concerns: after reviewing its badge tracking system, the Hospital told the patient that Chavez's badge only registered in the room "one time," so he must not have entered "into [her] room again" after she "expressed concern." (Doc. 64). Chavez, for his part, testified that he left the room when the nurse told him to and did not reenter—there is no mention of Dr. Fry staring at him to get him to leave. *Id.* at p. 78:7–15.

EEOC claims that Drs. Beal and Fry chose to exclude Chavez from their deliveries not because he stared at patients' genitals, failed to leave when directed, and lacked respect for patient privacy, but because he is male. It points to the January 20 conversation between McClain and Dr. Beal and McClain's general belief that the doctors were excluding Chavez because he is male. McClain also testified that Dr. Beal referred

12

to Chavez as "the boy." (Doc. 63-1, p. 36:11–22 (McClain Dep.)). EEOC also points to Dr. Fry's statements at the nurses' station that "she didn't want a male in rooms, and that she prided herself on telling her patients that they would only see females." (Doc. 63-3, p. 12:18–20 (Lancelot Dep.)). Lancelot told Chavez that Drs. Beal and Fry did not want him to assist in their deliveries because he was a male, but Chavez was not sure exactly what the doctors had actually said to her. (Doc. 63-5, pp. 90:18–25, 92:9–15 (Chavez Dep.)). Moreover, while Drs. Fry and Beal may have considered Chavez unprofessional, NWAH's investigation of the patient complaint indicates that the Hospital itself did not believe Chavez engaged in any wrongdoing justifying his exclusion. (Doc. 64).

### III.  DISCUSSION

EEOC brings a single claim for sex discrimination under Title VII of the Civil Rights Act of 1964, which prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The parties agree that EEOC's claim should be analyzed under the *McDonnell Douglas* burden-shifting framework. Under that framework, the employee must first make out a *prima facie* case for discrimination, which shifts the burden to the employer to put forth a legitimate, nondiscriminatory reason for its actions, which then shifts the burden back to the employee to show that the employer's proffered reason is pretextual. To make out a *prima facie* case, the employee (or EEOC) must show the employee: "(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; and (3) suffered an adverse employment action; (4) under circumstances permitting an inference of discrimination." *Parker v. U.S. Dept. of Agric.*, 129 F.4th 1104, 1111–12 (8th Cir. 2025) (citation modified).

NWAH argues that EEOC cannot, as a matter of law, prove that Chavez suffered an adverse employment action under circumstances permitting an inference of discrimination.

The first question is whether Chavez's exclusion from roughly half of vaginal deliveries at the Hospital constitutes an adverse employment action. An adverse employment action is a "'disadvantageous' change in an employment term or condition" or, put differently, an action that works "some injury respecting [the employee's] employment terms or conditions." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354, 359 (2024) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). In its recent *Muldrow* decision, the Supreme Court held that said disadvantage or injury does not have to "meet a heightened threshold of harm—be it dubbed significant, serious, or something similar," abrogating the Eighth Circuit and several others that had adopted heightened harm requirements. *Id.* at 353. NWAH attempts to distinguish *Muldrow* and relies heavily on pre-*Muldrow* cases that apply the incorrect standard for adverse employment actions.

Here, EEOC has presented evidence that Chavez had fewer opportunities to directly assist with patient care and receive on-the-job training. A reasonable jury could conclude that Chavez's exclusion constituted a disadvantageous change in his conditions of employment. While, as NWAH argues, Chavez may not have suffered *as much* as Muldrow, EEOC has produced evidence that he suffered some harm respecting his employment conditions.

NWAH also asserts that "a plaintiff cannot state an adverse employment action if he voluntarily resigned." (Doc. 57, p. 13 (quoting *Fenney v. Dakota, Minn. & E. R. Co.*,

14

327 F.3d 707, 717 (8th Cir. 2003)). NWAH reads this rule too far—separation from employment via voluntary resignation is not itself an adverse employment action unless it rises to the level of constructive discharge. *Brown v. City of Dermott*, 151 F.4th 985 (8th Cir. 2025). But, as *Muldrow* makes clear, an action does not have to meet a heightened bar of harm to constitute actionable discrimination in the terms or conditions of employment, unlike constructive discharge claims, where the discrimination must rise to a level "where a reasonable person in [the employee's] position would have felt compelled to resign." *Muldrow*, 601 U.S. at 353; *Norgren v. Minn. Dep't of Hum. Servs.*, 96 F.4th 1048, 1056 (8th Cir. 2024) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). EEOC cannot point to Chavez's resignation from NWAH as the adverse employment action on which they anchor their sex discrimination claim, and they have not done so.

Finally, NWAH argues that Chavez's job duties and responsibilities did not change because Drs. Beal and Fry had good reason for excluding him. This blurs the line between the adverse employment action element and the discrimination element. The reasons for an action do not provide evidence of whether that action was or was not injurious. EEOC has put forth evidence from which a reasonable jury could conclude that Chavez suffered an adverse employment action.

The second question is whether the circumstances surrounding Chavez's exclusion support an inference of discrimination. NWAH argues that EEOC cannot point to circumstances giving rise to an inference of discrimination because it has failed to identify similarly situated female employees who were treated more favorably. "Comparative evidence is certainly not the 'exclusive means by which a plaintiff may establish an inference of discrimination' however." *Lewis v. Heartland Inns of Am., L.L.C.*,

15

591 F.3d 1033, 1040 (8th Cir. 2010) (cleaned up) (quoting *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998)). "A plaintiff can establish an inference of discrimination in multiple ways, such as by showing more favorable treatment of similarly situated employees who are not in the protected class, biased comments by a decisionmaker, or that the employer failed to follow its own policies or shifted its explanation of the employment decision." *Mayorga v. Marsden Bldg. Maint. LLC*, 55 F.4th 1155, 1162 (8th Cir. 2022). Here, EEOC has produced evidence of biased comments by decisionmakers. The circumstances support an inference of discrimination, and EEOC can make out a *prima facie* case of sex discrimination.

The burden therefore shifts to NWAH to point to a legitimate, nondiscriminatory reason for its actions. It offers the following: "The Physicians [Drs. Beal and Fry] declined Chavez's assistance during future vaginal deliveries not because of his sex, but because of his unprofessional conduct and failure to respect patient privacy in accordance with federal law." (Doc. 57, p. 20). NWAH points to the January 18 and 19 deliveries where Chavez was asked to leave the room, and the subsequent January 26 complaint. The precise factual contours of the January 18 delivery are disputed, but that dispute is not material. "The normal rule in discrimination cases is that if an employer honestly believes that an employee is [subject to an adverse employment action] for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination." *Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008). Unprofessional conduct, patient privacy rights, and safety concerns are all legitimate reasons for NWAH to have excluded Chavez from some vaginal deliveries, or even all vaginal deliveries. And while NWAH has produced evidence

16

that those were Drs. Beal and Fry's reasons for excluding Chavez, NWAH is the employer, so the question is whether those were, in fact, NWAH's reasons.[9] Which brings us to pretext.

"The plaintiff may prove pretext by adducing enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012). The wrinkle in this case is that Drs. Beal and Fry believed their patient's claim—but NWAH did not—casting doubt on whether NWAH actually believed Chavez engaged in unprofessional conduct justifying his blanket exclusion. Following its "investigation" of her complaint, NWAH told the patient "Once you had expressed concern with the male tech, he did not enter into your room again." (Doc. 64). Drs. Beal and Fry were the people who decided to exclude Chavez from their delivery rooms, but they were not his employer, were not employees of his employer, and are not defendants in this lawsuit. While NWAH now relies on Drs. Beal and Fry's assessment of Chavez's conduct as unprofessional, viewing the evidence in the record in the light most favorable to EEOC, a jury could reasonably conclude that NWAH's own investigation clearing Chavez undermines its purported reliance on this unprofessional conduct as justification for allowing Drs. Beal and Fry to categorically exclude him from their patients' deliveries.

---

[9] Neither party discusses the propriety of imputing Drs. Beal and Fry's intent to NWAH, which is not their employer. NWAH appears to assume that the doctors' beliefs and intent are imputed to the Hospital, even where, as here, there is evidence that the Hospital did not share the doctors' good faith belief that Chavez engaged in misconduct. EEOC by contrast argues that NWAH negligently failed to enforce its anti-discrimination policies against Drs. Beal and Fry as proof of discriminatory intent. EEOC cites nothing in support of this theory of liability. These issues do not lend themselves to straightforward resolution, and the Court will not attempt to untangle them when the parties have not adequately briefed them.

NWAH's reliance on patient privacy interests is also an uncomfortable fit with the facts of this case. While privacy rights are certainly a legitimate basis for excluding an employee from a particular patient's room, NWAH allowed Drs. Beal and Fry to apply a blanket ban. Without Chavez's conduct to rely on in justifying this blanket ban, NWAH's resort to patient privacy also wants for factual support.[10] NWAH has failed to meet its burden of proving the absence of a genuine factual dispute with respect to pretext.

### IV.  CONCLUSION

There are genuine issues of material fact regarding why Drs. Beal and Fry excluded Chavez from their delivery rooms and, more pertinently, why NWAH allowed them to. NWAH's Motion for Summary Judgment (Doc. 56) is **DENIED**.

**IT IS SO ORDERED** on this 28th day of May, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE

---

[10] Had NWAH wished to argue that the privacy concerns raised by a male noncertified surgical technician in the labor and delivery unit cannot be dealt with on a patient-by-patient basis, it should have argued for summary judgment based on the affirmative defense for bona fide occupational qualifications. 42 U.S.C. § 2000e-2(e)(1).